UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ZACHARIAH M. BRALEY, and ROBERT
J. BRALEY, JR., *court-appointed guardian*
*of Zachariah M. Braley,*

        Plaintiffs,

                                    Case Number 06-11990-BC
v.                                            Honorable Thomas L. Ludington

MIDLAND COUNTY EDUCATIONAL
SERVICES AGENCY, MIDLAND PUBLIC
SCHOOL DISTRICT, MARK MOODY,
MICHELLE RENEE MILLER, WAYNE
STUART DRAVES, CHRISTOPHER
COLIN MOE, JAMES ROBERT MOE,
SANDRA ELAINE MOE, TERRY GILSTAD,
ELLEN PEDEN, and MICHAEL WORTH,

        Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT CHRISTOPHER MOE'S MOTION FOR SUMMARY JUDGMENT,
DENYING DEFENDANT MIDLAND PUBLIC SCHOOL DISTRICT'S MOTION FOR
SUMMARY JUDGMENT AS MOOT, AND DENYING DEFENDANTS SANDRA
ELAINE MOE AND JAMES ROBERT MOE'S MOTION FOR SUMMARY JUDGMENT**

        This matter is before the Court on three motions for summary judgment filed by Defendant Christopher Moe ("Moe"), Defendant Midland Public School District ("MPSD"), and Sandra and James Moe ("Moe's Parents"). Plaintiff Zachariah Braley ("Plaintiff") and Moe are developmentally disabled students that were enrolled in a public school special education program in 2004. Allegedly, Moe assaulted Plaintiff after the program's staff allowed Moe to be unattended

with Plaintiff. Plaintiff filed a complaint alleging gross negligence against program staff,[1] assault and battery against Moe, and negligence against Moe and Moe's parents. Plaintiff also brought civil rights and discrimination claims against Defendants Midland County Educational Service Agency ("MCESA"), MPSD, and Program's Staff. Plaintiff alleged violations of his civil rights under 42 U.S.C. § 1983 and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws. § 37.2101 *et seq.* Additionally, Plaintiff alleged discrimination claims under 29 U.S.C. § 794, 20 U.S.C. § 1681(a), and Michigan's Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 *et seq.*

On October 5, 2007, the Court held a hearing on Defendants' motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56. Moe contended that due to his mental disabilities he was unable to form the requisite intent for the intentional torts of assault and battery. Additionally, Moe's parents contended that Plaintiff's negligence claim failed as Moe's parents were unaware of Christopher Moe's sexual tendencies nor was their failure to warn program staff the proximate cause of Plaintiff's injury.

I

On June 10, 2004, Moe allegedly sexually assaulted Plaintiff while attending both were present at a educational program for disabled students. Plaintiff suffered from numerous disabilities, including quadriplegia, cerebral palsy, epilepsy, and severe visual impairment. At that time, Plaintiff was a student in the Severely Multiply Impaired ("SXI") program, an educational program for the disabled, operated by MCESA in a classroom leased from MPSD at one of its intermediate schools. MCESA offered educational services for Plaintiff pursuant to an "Individualized

---

[1] Members of the program staff include Mark Moody, Michelle Renee Miller, Michael Worth, Terry Gilstad, Ellen Peden, and Wayne Stuart Draves (collectively "Program Staff").

Educational Program" ("IEP") contract. MCESA educated students of varying disabilities as part of the IEP.

On June 10, 2004, Plaintiff was a student in the IEP in which he was under the supervision of two care givers. The care givers drove Moe to the SXI classroom for the purpose of gathering the SXI program's laundry. When Moe and his care givers arrived, Plaintiff, SXI educators, and staff were present. According to the complaint, Moe asked for permission to push Plaintiff around in his wheelchair. A staff member granted permission, Moe took control of Plaintiff in his wheelchair and departed the SXI classroom without any other supervision. After a few minutes, a staff member realized that Plaintiff and Moe were absent. A fellow employee heard sounds coming from the boys' restroom. They investigated the noise and found Plaintiff and Moe on the restroom floor.

Allegedly, Moe had sexually assaulted Plaintiff. Moe had unfastened Plaintiff's wheelchair restraints and removed Plaintiff from his wheelchair. Plaintiff was lying on his back on the floor of the bathroom with his diaper pulled down exposing his genitals, which were covered in blood. Moe was observed with blood on his mouth.

Plaintiff brought a total of nine claims against eleven different defendants. Plaintiff alleged assault and battery, as well as negligence, against Moe. Additionally, Plaintiff brought an action for negligence against Moe's parents. Moe and Moe's parents filed motions for summary judgment. Plaintiff, in his response, agreed to dismiss the negligence claim against Moe. As to the negligence claim against Moe's parents, the Court found that it was premature to grant summary judgment at the intermediate stage of discovery and denied the motion without prejudice on the record. Additionally, MPSD moved for summary judgment, but all parties stipulated to dismiss MPSD. As

such, its motion is moot.

As a result, only Moe's motion for summary judgment of the assault and battery claim remains before the Court. The crux of Moe's argument is that Moe, a developmentally disabled person, was unable to form the requisite intent to commit an intentional tort. In support of his motion, Moe submitted various psychological and medical reports detailing his disabilities since 1995. Moe was fifteen years and ten months old at the time of the alleged incident.

Moe underwent a pediatric neuropsychological evaluation at age six years and five months. *Moe Summ. Judgment, Exhibit J.* According to the evaluation, Moe's mother was mentally retarded and abused alcohol, cigarettes, and drugs during her pregnancy. Moe's behavior was erratic and was described as impulsive, hyperactive, inappropriate, cruel, and destructive, among other things. A cognitive ability test indicated that Moe's mental age was 3.9 years.

At age six years and six months, a certified social worker drafted a letter detailing Moe's behavior. *Moe Summ. Judgment, Exhibit A.* According to the letter, Moe had been previously diagnosed with fetal alcohol syndrome, epilepsy, attention deficit hyperactivity disorder, functioning mild to moderate mental retardation, mild cerebral palsy, and congenital brain malfunctioning. The letter described Moe's behavior as "extremely dangerous, impulsive, self-destructive, and disruptive."

At age eight years and seven months, a letter from the Developmentally Disabled Clinic at the University of Michigan Medical Center indicated that Moe had been twice hospitalized for "out of control" behavior. *Moe Summ. Judgment, Exhibit B.* According to the letter, Moe suffered from autism and "mild to moderate mental retardation." I.Q. tests revealed that Moe had a verbal I.Q. of 57 and performance I.Q. of 46, with a score of 100 being the mean. These scores indicated that Moe

had a mental age of a child that was six years and six months old.

At age eleven years and four months, a social work assessment noted that Moe's behavior had moderately improved. *Moe Summ. Judgment, Exhibit H.* Despite the improvement, Moe could still be "violent and physically destructive to himself, others, and his environment." Such behaviors included physical violence, starting fires, inappropriately undressing himself in public, and playing with dangerous objects.

Moe underwent a second pediatric neuropsychological evaluation at age eleven years and six months. *Moe Summ. Judgment, Exhibit G.* As part of the evaluation, Moe's parents answered a series of questions relating to his behavior. As a result, the report found that Moe's maturity varied from as little as a social age of a nineteen month child to a communicative ability of a four year old. The report placed Moe's "general development" under three years of age and described his behaviors as "extremely impulsive and aggressive." His overall cognitive skills were determined to be "severely impaired."

At age twelve years and two months, Moe underwent a behavioral assessment that noted that Moe was "prone . . . to causing injury to others." *Moe Summ. Judgment, Exhibit I.* According to the assessment, Moe occasionally engaged in "inappropriate sexual behavior," including an incident with a three year old boy. The assessment noted that his parents and the public school system had difficulty managing Moe and that his behavior was regressing. In an attempt to improve his behavior, Moe attended five months of treatment at a neurological rehabilitation institute. The assessment concluded that the treatment yielded modest results, largely as a result of medication.

On March 11, 2001, Moe was badly burned in a fire, which he ignited. As part of his medical treatment, he underwent an assessment on October 11, 2001 at age thirteen years and two months. The assessment indicated that Moe required "continuous supervision and behavioral training" and that he must be "closely monitored at all times." The assessment lists a series of accomplishments including that "school has gone well" and Moe's involvement in a series of activities including bike riding, reading, playing "sit down games," and fishing.

At age fifteen and three months, mental health staff, after conducting a series of tests, recommended that Moe live in an institutional setting.

A few weeks before the alleged assault, the MCESA prepared a report documenting Moe's progress. *Plaintiff's Response, Exhibit 1*. Moe attended an educational program still under the supervision of two care givers, but with two other classmates. The report indicated that Moe still "demonstrate[d] very impulsive behaviors," but his behavior was improving. The report came to the following conclusion.

> [T]he staff feel that [Moe's] positive behavior has increased. Large outbursts of negative behavior are very rare and almost nonexistent. He has responded very favorably to the advent of more students in the classroom and has developed a friendship with one of the boys. [Moe] appears to like the program and functions with added maturity since the other boys have joined the class . . . The overwhelming feeling regarding [Moe] is that he will continue his positive behavior, and demonstrate more independence and self reliance through the current programming and the consistent application of this plan.

At the time of that report, Moe was age fifteen years and nine months old.

In support of his motion for summary judgment, Moe submitted the affidavit of state licensed psychologist, Kathy Dollard. *Moe's Summ. Judgment, Exhibit F*. On July 6, 2007, Dollard testified that Moe "is an extremely impulsive person who does not understand and appreciate the causal relationship or link between his actions and the results." *Id.* at ¶ 6. Moe's disabilities are

"extremely severe and very unique" and Moe exhibits typical behavior for a person with fetal alcohol syndrome, but "more distinct and pronounced due to other genetic, physiological, and psychological conditions." *Id.* at ¶ 9. Dollard added that Moe's mental age has been estimated at six years and six months old, though her statement was not clear whether the estimate was current. *Id.* at ¶ 5.

II

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find

for the plaintiff." *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

III

The Court has subject matter jurisdiction over the matter pursuant to Plaintiff's causes of action brought under federal law. 28 U.S.C. § 1331. The Court may exercise pendent jurisdiction over Plaintiff's related state claims, including the assault and battery claim, and the Court must apply Michigan law to those claims. 28 U.S.C. § 1367; *see generally Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938).

As previously stated, Moe asserts that he was incapable of forming the requisite intent required to commit an assault or a battery. To establish a prima facie claim of assault under Michigan law, "a plaintiff must show an intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Vanvorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004) (internal quotations and citations omitted). To establish a prima facie battery claim, a "plaintiff must demonstrate a wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* (internal quotations and citations omitted). Thus, in order for Plaintiff to establish a prima facie claim for assault and battery, he must be able to create a triable issue of fact that Moe acted with intent.

The concept of "intent," and the requisite ability to formulate it, has received more regular attention in the criminal law. It is the element of intent, for example, that distinguishes first-degree premeditated murder, requiring an "actual intent to kill," from second-degree murder. *People v. Dykhouse*, 345 N.W.2d 150, 151 (Mich. 1984).[2] In the criminal law, general intent, otherwise referred to as mens rea or scienter, generally refers to an actor's actual intent to perform the actus reas of a crime, while specific intent crimes are described as requiring an accompanying intended result. *See e.g. People v. Buck*, 496 N.W.2d 321, 326-27 (Mich. Ct. App. 1992) (discussing whether aider and abettor liability requires knowledge of the perpetrator's intent). Indeed, criminal liability is excused if "as a result of mental illness[3] . . . or mental retardation[4] . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law." Mich. Comp. Laws § 768.21a.

The concept of intention, as an element of a cause of action in civil tort law, while receiving less universal attention than in the criminal law, raises a qualifying consideration for the imposition of tort liability. Professor John Finnis, in addressing the question of whether the early twentieth

---

[2] Second degree murder is a homicide committed with malice. The actor must be found to have (a) intended to kill, (b) intended to do serious bodily injury, or (c) acted with wanton and willful disregard such that the natural tendency of his behavior was to cause death or great bodily harm under the circumstances which do not excuse or justify the killing, or mitigate the degree of the offense to manslaughter. *People v. Morrin*, 187 N.W.2d 434, 438-39 (Mich. Ct. App. 1971).

[3] " 'Mental illness' means a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Mich. Comp. Laws § 330.1400(g).

[4] " 'Mental retardation' means a condition manifesting before the age of 18 years that is characterized by significantly subaverage intellectual functioning and related limitations in 2 or more adaptive skills and that is diagnosed based on the following assumptions: (a) Valid assessment considers cultural and linguistic diversity, as well as differences in communication and behavioral factors. (b) The existence of limitation in adaptive skills occurs within the context of community environments typical of the individual's age peers and is indexed to the individual's particular needs for support. (c) Specific adaptive skill limitations often coexist with strengths in other adaptive skills or other personal capabilities. (d) With appropriate supports over a sustained period, the life functioning of the individual with mental retardation will generally improve. Mich. Comp. Laws § 330.1100b(15).

century bifurcation of torts into intentional and negligent should be abandoned, describes "intention" as follows:

> Intention is a tough, sophisticated, and serviceable concept, well worthy of its central role in moral and legal assessment, because it picks out the central realities of deliberation and choice: the linking of means and ends in a plan or *proposal*-for-action *adopted* by *choice* in preference to alternative proposals (including to do nothing). What one intends is what one chooses, whether as end or as means . . .

John Finnis, *Intention in Tort Law, in* PHILOSOPHICAL FOUNDATIONS OF TORT LAW 229, 229 (David G. Owen ed., 1997) (emphasis in original).

No matter the merit of abandoning the theoretical distinctions between negligent and intentional misconduct, Michigan law, indeed American law generally, treats the two distinctly. Additionally, Michigan law treats "excuses" for civil liability because of incapacity very differently based on different kinds of disability. Children under the age of seven, for example, are excused by reason of incapacity, for civil responsibility for negligent conduct. In contrast, children age seven and older are evaluated by a "reasonable person standard" defined by the same age, capacity and experience. *See e.g. Bragan v. Symanzik*, 687 N.W.2d 881, 884 (Mich. Ct. App. 2004). Moreover, the general negligence standard of due care, regardless of age, is also modified to consider the physical characteristics of the defendant. That is, defendants with physical handicaps are to be evaluated against the conduct that a reasonably careful person who has the same physical disability would use. *Covert v. Randall*, 298 N.W. 396, 397 (Mich. 1941).

The civil law has been less charitable in addressing the mentally ill or mentally retarded for civil liability. Simply stated, "the great weight of authority is that an insane person is civilly liable for his torts. *Barylski v. Paul*, 196 N.W.2d 868, 869 (Mich. Ct. App. 1972). Indeed, this proposition appears to be relatively well-settled American common law. C.R. McCorkle, Annotation, *Civil*

*Liability of Insane or Other Mentally Disordered Person for Assault or Battery,* 77. A.L.R. 2d 625 (1961). The Restatement Second of Torts provides that "[o]ne who has deficient mental capacity is not immune from tort liability solely for that reason." RESTATEMENT (SECOND) OF TORTS § 895J (1979). The rational for this proposition, which contrasts with the civil law rule of law, was clearly articulated in *Yancey v. Maestri*, 155 So. 509, 514-15 (La. Ct. App. 1934), as follows:

> The soundness of the fundamental principles underlying the public policy announced by the common-law and civil law rules has been the subject of much discussion and criticism. The common-law rule is predicated on three grounds:
>
> First, that where one of two innocent persons should bear a loss, it should properly fall on him whose act caused it; second, that imposing liability on an insane person's estate for his torts is a deterrent to the careless confining and guarding of the insane person by relatives, or those charged with that duty; and, third, that exemption from liability would lead cunning evildoers to resort to a plea of insanity as a ruse to protect them from their nefarious work, it being difficult to prove that a person is sane.
>
> The civil law rule is based upon the theory that recovery in tort cases is allowed upon the ground that the wrongdoer did something, or failed to do something, that ordinary care, prudence, and foresight dictated that he either should or should not have done under the circumstances, but that, since an insane person is not a rational being, he is incapable of appreciating right from wrong, or distinguishing carefulness from carelessness, and, therefore, his acts are looked upon as inevitable accidents. The common law considers the effect of the insane person's act, while the civil law regards the cause of it. The difference of view is the result of the method of approach which the two schools of thought have pursued.

However, as is emphasized in comment C to the Restatement, while the mental condition of the defendant may not be taken into account in determining whether the defendant is liable for his torts, mental condition must, nonetheless, "be taken into account in determining whether in the particular instance any tort has been committed at all." RESTATEMENT (SECOND) OF TORTS § 895J (1979). In *Barylski*, the court provided that the fact finder could consider the defendant's capacity in deciding whether the defendant "did commit the tortious act." *Barylski,* 196 N.W.2d at 869. Similarly, the Michigan Supreme Court concluded that " . . . an insane or mentally ill person can

intend or expect the results of his actions within the meaning of an insurance policy's exclusionary clause." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 435 (Mich. 1992). The Court, however, predicated its analysis on the record; it stated that a court should "look[] at the available facts." *Id.* at 434. Accordingly, under Michigan law, the factual question that must be addressed is whether Moe had the mental capability to intend his conduct as distinct from his intent to harm.

As chronicled above, Moe submitted extensive medical records documenting his diminished mental capabilities and contends that they indicate that he had the mental capacity of a child that is six years and six months old. It is uncontroverted that Moe suffers from severe mental disabilities. Yet, Moe's medical records do not establish the absence of a genuine issue of fact regarding his ability to form the requisite legal intent. The Court concludes that there is a triable issue of fact because Moe's evidence supporting his position is largely stale and that the most current reports indicate improvement in Moe's mental condition.

First, the vast majority of Moe's medical evidence, while relevant to his development, is dated. The evidentiary record documents Moe's long-standing disabilities and indicates that Moe has a mental age of someone who is younger than his physical age. A majority of the record, however, documents Moe's disabilities long before the date of the alleged incident. The strongest evidence in support of Moe's position is the affidavit of Kathy Dollard, a licensed psychologist, which states that Moe's "I.Q. is [sic] has been measured to be approximately 41 . . . indicating his cognitive level is approximately that of a child age six years, six months." That statement does not make clear whether Moe's cognitive level is currently at that level, or has been measured at that level. For example, a neuropsychology report, written in 1995, also estimated Moe's cognitive ability to be that of a six year, six month old. Moreover, most of Moe's documentation offered in

support his motion originates from 1995 to 2000. The alleged incident occurred in June of 2004. The mere fact that Moe's physical age was fifteen and ten months, coupled with a lack of recent medical evaluations, compels the Court to find that there is a triable issue of fact with regard to Moe's intent to cause the conduct.

Second, the most current documentation indicates improvement and that Moe's mental disabilities were decreasing in severity. In opposition to the motion, Plaintiff submitted a MCESA report that describes the "increase" of Moe's "positive behavior." The report stated that "large outbursts of negative behavior are very rare and almost nonexistent" and that "[t]he overwhelming feeling regarding [Moe] is that he will continue his positive behavior, and demonstrate more independence and self reliance . . . ". Additionally, the report indicated that Moe was displaying increasing maturity. Though the report does not directly address Moe's mental ability to form intent, the report does provide circumstantial evidence that Moe exhibited increasing control over his conduct.

The dated nature of most of Moe's evidence compared to his physical age and the most recent behavioral report on him indicates that there is a triable issue as to his ability to intend an act. Though the record may indicate that Moe may not have fully appreciated the severity of his act, there is a triable issue with regard to whether Moe intended to commit the act. Thus, the Court is unable to conclude, as a matter of law, that Moe was incapable of controlling conduct and will deny his motion for summary judgment.

IV

Accordingly, it is **ORDERED** that Defendant Christopher Colin Moe's motion for summary judgment [dkt # 36] is **GRANTED IN PART** and **DENIED IN PART**. As to Plaintiff's claim

against Defendant predicated on a negligence theory, Defendants' motion is **GRANTED** and Plaintiff's claim of negligence, count VIII, is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Defendant Sandra Elaine Moe and Defendant James Robert Moe's joint motion for summary judgment [dkt # 40] is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that Defendant Midland Public School District's motion for summary judgment [dkt # 33] is **DENIED** as moot**.**

                                               s/Thomas L. Ludington
                                               THOMAS L. LUDINGTON
                                               United States District Judge

Dated: November 8, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 8, 2007.

                         s/Tracy A. Jacobs
                         TRACY A. JACOBS